its aid to enforce a contract founded in a fraud upon the United States. The fraud is admitted in the bill itself.

Mr. Jones, contra, contended that, as F. Marsteller died insolvent and left no personal representative, it was not necessary that his next of kin should be parties. The solvent partners are liable inter se, for the loss by the insolvent partner.

CRANCH, Chief Judge, after stating at large the evidence of the partnership of the defendant in the transaction, said:—

We think, therefore, that the fact of partnership between the plaintiff and defendant and F. Marsteller is established.

The next question is, whether the court can make a final decree, unless the personal representatives be made parties in the cause? We think we cannot. Mr. Marsteller was equally interested with the plaintiff and defendant in the profit or loss upon the government contract. The interests of his personal representatives are equally affected by the settlement of the account. But even if they were parties, we are of opinion that the copartnership was a fraud upon the United States, and that a court of equity ought not to lend its aid to either of the partners against the other. It is proved that Mr. Marsteller himself was the agent of the government in making the contract; and it is expressly averred in the plaintiff's bill, "that, when this contract was made, it was understood and agreed between George Coleman, the defendant, and Ferdinand Marsteller, now deceased, that they should share with your orator the profits of the contract; that is to say, that each should receive one third of the profits." If this be not fraud per se, it is such strong evidence of it that the court, in the absence of all exculpatory proof, must consider the transaction as fraudulent. No such exculpatory proof is produced; but the plaintiff himself avers that great frauds were committed upon the government by Mr. Marsteller. Under these circumstances, this court, as a court of equity, will not lend its aid to enforce this iniquitous agreement, but will leave the parties to their legal remedies. The bill must be dismissed, but without costs.

MORSELL, Circuit Judge, concurred. THRUSTON, Circuit Judge, absent.

[NOTE. This decree was afterwards affirmed by the supreme court on the ground that "public morals, public justice, and the well-established principles of all judicial tribunals" forbid the interposition of courts of justice to lend their aid to enforce a contract which began with the corruption of a public officer. The opinion was delivered by Mr. Justice Baldwin. Bartle v. Nutt, 4 Pet. (29 U. S.) 184.]

BARTLE, (UNITED STATES v.) See Case No. 14,531.

## Case No. 1,073.

### BARTLEMAN v. DOUGLASS.

[1 Cranch, C. C. 450.] [1]

Circuit Court, District of Columbia. Nov. Term, 1807.

PLEADING—ASSUMPSIT—RELEASE—FRAUD.

1. An agreement by the plaintiff to release the defendant upon his executing a deed, is a good defence in assumpsit, the deed being executed.

2. A promise by the defendant to pay the plaintiff an additional sum is a fraud upon the other creditors, and is void.

At law. Assumpsit. Non assumpsit and issue.

Mr. E. J. Lee, for the defendant, gave in evidence an agreement of the plaintiff and other of his creditors, to release him on executing a deed of his property to such trustees as the subscribers should appoint, and that he executed such a deed.

Mr. Swan, for the plaintiff, contended. 1. That the plaintiff never approved the trustees, or the deed. 2. That no release was ever executed by the plaintiff. 3. That the defendant promised to secure the plaintiff in another debt due from the defendant and another.

Mr. E. J. Lee, in reply, cited Cockshot v. Bennett, 2 Term R. 763, and Butler v. Rhodes, Peake, 238.

THE COURT (FITZHUGH, Circuit Judge, contra) refused to instruct the jury that the agreement and deed did not make a good defence at law; being of opinion that the agreement bound the plaintiff to give a release upon the execution of the deed, and a court of equity would have compelled him to execute it; and that in assumpsit it ought to be admitted in evidence on the general issue, it being a fraud upon the defendant as well as upon the other creditors that the plaintiff should refuse to execute the deed after the others had executed it. See Heathcote v. Crookshanks, 2 Term R. 24; Jackson v. Duchaire, 3 Term R. 551; and Jackson v. Lomas, 4 Term R. 166.

BARTLEMAN, (SCOTT v.) See Case No. 12,524.

## Case No. 1,074.

### BARTLEMAN v. SMARR.

[2 Cranch, C. C. 16.] [1]

Circuit Court, District of Columbia. Dec. Term, 1810.

AFFIDAVIT TO HOLD TO BAIL.

[Cited in Clarke v. Druet, Case No. 2,850.]

Mr. Law, for the defendant, moved to appear without bail. There was an affidavit

[1] [Reported by Hon. William Cranch, Chief Judge.]

filed, charging the defendant in the following manner: "1809, Oct. 5. To goods per bill, $19.89," with an affidavit "that the above account is just and true."

THE COURT was of opinion that it was not a sufficient affidavit to hold the defendant to bail.

---

## Case No. 1,075.

BARTLETT et al. v. BUDD et al.

[1 Lowell, 223.] [1]

District Court, D. Massachusetts.    Feb. Term, 1868.

### ANIMALS—CONVERSION OF DEAD WHALE—SALVAGE SET-OFF—DAMAGES.

1. A whale killed and taken into complete possession is the property of the taker, who may maintain an action against one who afterwards appropriates it, whether with or without knowledge of his title.

2. *Held*, that an alleged usage that a whale found adrift in the ocean is the property of the finder unless reclaimed by the owner before it is cut in, was not proved in this case. Quaere, whether such a usage would be valid?

[Cited in Swift v. Gifford, Case No. 13,696; Ghen v. Rich, 8 Fed. 160.]

3. Salvage cannot be given by way of set-off when the finder has throughout contested the title of the owner.

4. The measure of damages adopted in Bourne v. Ashley, [Case No. 1,699,] adhered to.

[Cited in Guibert v. The George Bell, 3 Fed. 585.]

In admiralty. Libel by [Ivory H. Bartlett and others] the owners of the bark Canton Packet, of New Bedford, against [John Budd and others] the owners of the ship Emerald, of Sag Harbor, for the value of a whale. [Decree for libellants.]

The first officer of the libellants' vessel killed several whales one afternoon in July, 1856, in a bay of the Okhotsk sea, and one of these he anchored in five fathoms of water, with an anchor which he borrowed from the mate of the Brunswick, and attached to the body what whalemen call a waif, that is, some article belonging to a whale-boat which may serve as a signal; in this case, a paddle and sail, and went on shore at some distance, for the night. The next morning two boats of the Emerald found the whale and towed it to their ship where it was cut in and boiled down. The witnesses on behalf of the respondents testified that they found the whale adrift, the anchor not holding, the cable coiled round the whale's body, and no waif or irons attached to .it. The original taker swore that he notified them on the spot that the whale was his. This they all denied.

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

T. M. Stetson, for libellants.
J. C. Stone, for respondents.

LOWELL, District Judge. A whale, being ferae naturae, does not become property until a firm possession has been established in the taker. But when such possession has become firm and complete, the right of property is clear, and has all the characteristics of property. Upon the evidence, the right to this whale appears to stand on the same footing as the right to the anchor attached to it, which was very properly restored to its owner: Taber v. Jenny, [Case No. 13,720.]

The respondents here, as in Taber v. Jenny, set up a usage that a whale found adrift in the ocean is the property of the finder, unless the first taker shall appear and claim it before it is cut in. To this the libellants' witnesses reply that the usage only applies to whales found with no marks of appropriation excepting harpoons or "irons." And they give the very plausible reason for this distinction that irons are not in fact sure signs that the whale has ever been captured; because it may, and often does, escape after being wounded, and die at a very considerable distance of time and place from that of its being struck. These witnesses go farther, and affirm that the usage does not obtain at all in bays and harbors, but only off soundings. Without deciding the last point, I find the preponderance of evidence to be very strong in favor of the libellants' version of the usage in the matter of the definite marks by an anchor, or other sure sign of actual capture. And if it were not so, there would be great difficulty in upholding a custom that should take the property of A. and give it to B. under so very short and uncertain a substitute for the statute of limitations, and one so open to fraud and deceit. I do not, however, here pass upon the limits within which usage may reasonably vary, whether upon the one side or the other, the strict law of the pursuit and capture of whales and their appropriation, but decide that this whale was the property of the libellants.

This is not a case of salvage, because the conduct of the finders was inconsistent with the idea of a saving for the benefit of the true owners. Taber v. Jenny, ubi supra. A libel for a conversion of the whale is the true remedy, and that has been adopted.

For the reasons given by me in another case, I am unable to adopt the rule of damages which Judge Sprague followed under the peculiar circumstances of Taber v. Jenny, but pronounce for the value of the whale in the Okhotsk sea in July, 1856, to be ascertained in the mode laid down in my former decision [Bourne v. Ashley, Case No. 1,699] with interest and costs.